## Miller, et al. v. Feather, et al.

(Decided June 12, 1917.)

## Appeal from Whitley Circuit Court.

1. Schools and School Districts—Statutory Provisions.—Section 3588a of the Statutes, construed and held to authorize a city of the fourth class having heretofore established graded schools under its charter, to change the system of management of such schools to the general graded school system provided for under sections 4464-4500b of Kentucky Statutes.

2. Schools and School Districts—Ordinances.—That the change in the system of control of such schools so authorized is effected by the city council by ordinance without an election.

3. Statutes—Constitutional Law.—That section 3588a of the Statutes is not in contravention of section 51 or 242 of the Constitution.

4. Schools and School Districts—Statutes.—That section 4464a of the Statutes is not applicable when such a change is attempted even though the city lies partly within two counties.

5. Schools and School Districts—Ordinances.—An ordinance of the city council making the change is not void because it does not follow the language of the statute in the manner of ordaining the change, if it substantially follows and complies with the statute under the circumstances prevailing in the city.

6. Schools and School Districts—Bonds.—De facto trustees of a graded school with color of title will not be enjoined, at the suit of citizens and taxpayers, from issuing and selling bonds under an election held pursuant to law for the maintenance of the schools and to erect necessary school buildings.

M. A. GRAY and H. C. GILLIS for appellants.

STEPHENS & STEELEY for appellees.

Opinion of the Court by Judge Clarke—Affirming.

The city of Corbin, Kentucky, is a city of the fourth class; about two-thirds of its territory located in Whitley county, and about one-third in Knox county. On the 9th day of April, 1912, it adopted a system of city graded schools as is provided by the charter of such cities, being sections 3588 to 3606, inclusive, Kentucky Statutes, under which system "The Board of Education" for the city had the power, and is was its duty, to maintain and manage graded schools for both colored and white pupils living within the city.

On February 8, 1916, a petition was filed with the mayor of the city of Corbin, at a regular meeting of its city counsel, signed by more than one hundred of the

legal white voters thereof requesting the mayor to call an election to take the sense of the legal white voters residing in the city as to whether or not the city should abolish the city graded schools as then constituted and controlled by the city and establish in lieu thereof graded common schools for the city as provided by the acts of the general assembly as set out in article X of chapter 113, being sections 4464-4500b, of Carroll's Edition of the Statutes of Kentucky, it being optional with a city of this class to adopt either of these two systems of control for its graded schools when such schools are first established, but appellants contend that after a city of this class has once adopted either system it cannot thereafter change to the other.

This proposition to convert the graded schools of the city from one system of control to the other of the two systems provided by our statutes, was suggested by and had the unanimous approval of the board of education for the city. In accordance with the request of the petition, the mayor, on February 14, 1916, not a regular meeting day for the city council, called an election to be held in the city on March 27, 1916, exclusively for the white voters of the city, which election was called for more than forty days and was duly advertised as required by law. There were cast in favor of the change in the school system 185 votes and opposed to it 106 votes, being a majority in favor of the proposition of 79 votes. This proposition was submitted by secret ballot. At the same time a board of trustees was elected by *viva voce* election, who are the defendants to this suit. These trustees afterwards, by appropriate orders and which are not questioned in this suit, except that the authority of the trustees to make the orders is contested, called an election to be held in said city on the 8th day of May, 1916, for the purpose of taking the sense of the white voters therein as to whether or not the graded free white common school district should issue and sell bonds in a sum not to exceed $25,000.00 for the purpose of constructing a suitable school building, the one previously existing having been burned some time in the early part of the year 1916. At this last election there were cast in favor of the proposition of issuing the bonds and levying a tax of not exceeding fifty cents on each one hundred dollars' worth of property and a poll tax not exceeding $1.50, 461 votes, and against it 23 votes. It is conceded that both of the elections above mentioned were duly canvassed and prop-

erly certified. The acting trustees of the graded free white school, elected March 27, 1916, were about to take steps to issue and sell the bonds as voted in the last election mentioned when the plaintiffs herein, who are residents and taxpayers of the district, filed this action seeking an injunction to prevent the defendants from issuing the bonds, levying any tax or acting in any way as trustees. A demurrer was sustained to their petition as amended and the petition dismissed upon their refusal to plead further, from which judgment they are appealing.

The grounds for relief sought are: (1) That the city of Corbin had no right under section 4489 of the statutes, or at all, to accept or to adopt the system of graded common schools provided by sections 4464 to 4500b, inclusive, Kentucky Statutes, after having adopted the system of city schools provided for in charters of cities of the fourth class, sections 3588 to 3606, inclusive. (2) That section 4464a of Kentucky Statutes permitting parts of two counties to be incorporated into a graded school district was not complied with as should have been done since the city of Corbin lies partly within two counties. (3) That if both of these positions are incorrect, the attempted change was ineffectual for the following reasons: (a) that the call for the election to take the sense of the voters upon the question was illegal and void because the mayor did not hold the petition filed with him from one regular meeting of the city council to the next; (b) because the question was submitted by secret ballot rather than *viva voce*. (4) That at said election no tax was voted, and, therefore, no graded school district established, and that the attempted election of trustees for a district which had not been established and had no existence was illegal and conferred nó authority upon them to call the election upon the question of issuing bonds and that that election was, therefore, void.

1. In support of the first contention, reliance is had upon the opinion of the Court of Appeals in Taylor v. Russell, 117 Ky. 539, in which section 4489 of the statutes was construed, and it was held that at that time there was no authority for a city of the fourth class to change from one system of graded schools to another, although a city of that class had the privilege in the first instance to accept either a city managed graded school or a district graded school. The case is exactly in point and unless the law has been changed since that opinion was delivered it is obvious that Corbin was with-

out authority to change from the city managed graded school it had adopted in 1912 to the district graded school, which it might have adopted in the first place. The opinion in the above mentioned case was rendered February 15, 1904, while the legislature was in session, and in March following, section 3588a of Kentucky Statutes was enacted, which statute appellees insist was enacted for the purpose of permitting the change denied in that opinion. Appellants insist, however, that that enactment had no such purpose and granted no such authority because by its language it has reference only to cities of the fourth class which had "heretofore" organized a system of free graded schools pursuant to the charter of such city. It is argued that it has no application to cases like the instant one where the graded school system has been organized under the charter since the enactment of that law. In other words, they insist upon a strict construction of the letter of the statute, while appellees insist that in construing the statute the purpose of the legislature in its enactment must be given effect. It is always permissible in construing a statute to consider the circumstances and purposes of its enactment. As was aptly said in the opinion cited above:

"The legislative purpose, if any doubt arises upon the language employed in the acts, will be looked to, rather than the mere dates of enactments, as the guide in construction. The import of the acts in question, viewed in connection with the general state of the law, and the history of the legislation, and previous judicial utterances, if any, upon the subject, are all legitimate and helpful means of arriving at the legislative purpose in the enactment of statutes which may appear to be inconsistent in terms or means provided."

As stated above, the legislature was in session when the Taylor v. Russell opinion was rendered and immediately thereafter enacted the statute involved. In the city of Richmond, Kentucky, where the controversy arose which was before the court in the case cited, graded schools were maintained and operated for both white and colored pupils under one board, the board of education, and the effect of the vote considered in that opinion is stated to have been "merely for the white voters to vote out the colored graded common school already adopted by the legal authorities in manner provided by law." Assuming, as under the circumstances we must, that the legislature in the enactment of the law, was dealing with

the condition resulting from that opinion, it is manifest from the act itself that the legislative intent was to enact a law that would permit cities of the fourth class to change the management of their graded schools from the city system to the district system.  It cannot be doubted that the legislature intended that the law enacted should apply generally and uniformly to all cities of the same class, although the statute enacted was evidently formed with the conditions existing in Richmond in mind, for otherwise the act would be in contravention of section 242 of the constitution, and it is equally clear that in construing the act we should construe it so that it will be constitutional, if possible, rather than unconstitutional. To construe the act literally the word "heretofore" would, of course, restrict its application as contended by appellants to such cities of the fourth class as had, upon the date the law was enacted, adopted the city system of graded schools, and would grant to such cities of that class the power to change from the one system of control of its graded schools to the other, but would withhold such power from cities of the same class that might thereafter adopt the city system of control.  This construction would deprive the act of the uniformity of application necessary under our constitution and render it unconstitutional.  This was certainly not the purpose of the legislature.  This result can be obviated by the substitution of the word "theretofore" for the word "heretofore" which evidently was inadvertently employed, and there can be no doubt of our authority and duty to make this substitution in order to preserve the constitutionality of the act, and to carry out the intent of the legislature, for when this substitution is made the law applies alike to all cities of the fourth class and confers uniform power upon all such cities.  Park v. McReynolds, 111 Ky. 651, 64 S. W. 517.  With this change in the phraseology of the act, and with the legislative intent still in mind, it is clear that the act did remove the disability of cities of the fourth class of changing from the city system of management of their graded schools to the other whenever that was done in such a way as not to affect the rights of pupils of both colors to graded school privileges, as will be seen from the act itself, which is as follows:

"3588a.—That any city of the fourth class having heretofore organized a system of free graded schools for the education of the white and colored pupils of said city, under and by virtue of the charter for cities of the fourth

class, and managed and controlled by a board of education, may, by ordinance passed by its general council, separate said system of graded free schools into a graded free white common school for the white pupils of said city, and into a graded free colored common school for the colored pupils of said city. When said system of schools has been so changed and separated as hereinbefore provided, each system shall be governed and controlled by a board of six trustees elected or appointed, as now provided by general law for the government of graded free white and colored schools. Each of said systems of graded free white and colored schools shall be supported and maintained by its *pro rata* share of the state school fund, which shall be paid by the State Superintendent of Public Instruction direct to said trustees or their treasurer and by such local taxation as may be or now is provided by law. No tax raised from the property or poll of any white person or corporation in said city shall be used for the support of said graded free colored common schools of said city, nor shall any tax raised from the property or poll of any colored person be used for the support of said graded free white common schools of said city. Said city shall fix by ordinance the maximum amount of tax that shall be levied in any one year on the one hundred dollars' worth of property owned by white citizens and corporations of said city and that the maximum poll tax that shall be levied upon each white male citizen over the age of twenty-one years, residing in said city, for white school purposes not to exceed the amount fixed by law, and likewise the maximum amount that shall be levied upon the one hundred dollars' worth of property owned by each colored person in said city, and the maximum poll tax that shall be levied upon each colored male citizen over the age of twenty-one years, residing in said city, for colored school purposes not to exceed the amount fixed by law, and when said amounts have been fixed the respective boards of trustees of said schools shall not levy and collect a greater amount. After said systems of graded free white and colored common schools have been established as hereinbefore provided for, the same shall be maintained, managed and controlled as provided for by general law for such schools. The city council shall appoint a board of trustees for each of said systems of graded free white and colored schools who shall act as trustees for said schools until the next succeeding regular election, when their succes-

sors shall be elected. When said systems of graded free common schools herein provided for shall have been established, the board of education of said city shall convey all the free school property in said city used by the white pupils to the board of trustees for the graded free white common schools, and all the free school property in said city used by the colored pupils to the board of trustees for the graded free colored common schools.

"If the city council shall pass an ordinance as hereinbefore provided for, separating the white and colored schools, either the white persons or the colored persons living in said district may hold an election as provided by the laws governing school elections in said district for the purpose of abolishing the white or colored graded common school system therein existing, the white persons only to vote with reference to the white graded common schools, and the colored persons only to vote with reference to the colored graded common schools; and if such election shall be held and the majority of the votes cast at same shall be in favor of abolishing the white or colored graded common school system in said district, the same shall be abolished."

It is insisted, however, by appellants that the act is unconstitutional because the power to change the system, if conferred, was not indicated by the title of the act, which is as follows:

"An Act to Empower Cities of the Fourth Class to Separate the Management and Control of their Schools Where the Same are now Under the Control of a Board of Education."

Section 51 of the constitution is as follows:

· "No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title, and no law shall be revised, amended or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revised, amended, extended or conferred, shall be re-enacted and published at length."

In construing this section of the constitution, it has been frequently held that if all the provisions of an act relating to the same subject are naturally connected and are not foreign to the subject expressed in the title, it is sufficient. See citation of authorities in note to the section in Kentucky Statutes. We think all of the provisions of the act under consideration are related to and connected with the subject of the act as expressed in the title

and within the purview of that title, and that the provisions for changing and abolishing the existing systems are not unconstitutional because they are parts of the method. provided for separating the management and control of the schools. We, therefore, conclude the city had the authority, under the above statute, to change its system of graded schools.

2. Section 4464a applies only to the *establishment* of a graded school district in territory, some of which, at least, is without the corporate limits of cities permitted to maintain city graded schools, and has no application whatever to the facts of this case, where it was not attempted to *establish* a district graded school, as we shall hereafter show, but where the only thing attempted was to change the management from one to the other of two permissible methods in a graded school district already established.

3. We need not discuss the objections of appellants to the validity of the election of March 27th, for the simple reason that no election is provided for or necessary to *change* the system of graded school control, as the city council, under section 3588a is plainly authorized by ordinance and without an election to make the *change*, and it is only necessary to submit to a vote the question of *abolishing* graded schools for either white or colored pupils, which, as explained in Russell v. Taylor, *supra,* results in a return to district common schools, and no such attempt was made here.

It is true the act provides that the *change* in the graded school system shall be by an ordinance separating the management and control of the schools for the white and colored children, and this was of course upon the theory that separate schools were maintained in all cities of the fourth class, but the fact remains that the city council is authorized to make the change by ordinance and without an election.

The city council of Corbin did, on April —, 1916, regularly adopt an ordinance changing the management of its graded schools from the city graded school to the district graded school, and that ordinance, we think, clearly effected the change without reference to the election held with that purpose in view. It is true the ordinance is not aptly drawn and states incorrectly the sections of the statutes under which the change is authorized, but these facts do not alter the fact that it does ordain the change the city council was authorized to make

under the law above referred to.   Nor does the fact that it does not in terms separate the management of the schools for the two races necessarily invalidate it since they may have been separated previously, so far as this record shows, or there may have been, as suggested by counsel for appellees, no necessity for such separation from the fact, if a fact, that there are in Corbin no colored children of school age and therefore no schools for such children.   At any rate, appellants' petition and exhibits allege and prove the enactment by the city council of an ordinance ordaining the change authorized by law, and the mere fact that the ordinance is not aptly drawn will not be seized upon to defeat the efforts of the old and new school boards and the city council as well as a majority of the voters in the city sufficiently interested to vote, to provide a system of free graded schools under which the burned school buildings may be rebuilt and the schools adequately equipped, which is not possible under the old system because of the city's indebtedness having reached the constitutional limit.

4.   Appellants' fourth contention is based upon the incorrect idea that it was necessary in order to effect a change of control, to *abolish* the city graded school and *establish* a new district graded school, and this same idea seems to have been responsible for the election of March 27th and for the form of the ordinance making the change; but as we have seen there was present no question of either abolishing or establishing a graded school.   The graded school had been established by the city in 1912 for the district co-extensive with the city and the only thing attempted or done was to change the system of management of the existing graded school in the existing graded school district.   This was accomplished by the ordinance and the election was without effect except that it enabled the acting trustees, with the consent and acquiescence of the old board of education and with the approval of the legal voters of the district and of the city council, to take possession of the offices and assume the discharge of the duties incident thereto.   The act permitting the change in systems of control provides that the city council shall name the new trustees, six in number, "as now provided by general law for the government of graded free white and colored schools," but the general law does not provide for six trustees, but provides for not more than one more trustee than the number of voting districts in the city when the district is co-extensive

with the city (section 4489) and for five trustees otherwise (section 4464). It is therefore plain the act is inconsistent as to the number of trustees necessary to manage the school after the change in the system. The act also provided that after the change in management the schools shall be "supported and maintained by its *pro rata* share of the state school fund, and by such local taxation as may be or now is provided by law," and that the city shall by ordinance fix the limits for such taxation. In the case at bar the ordinance set up in appellants' petition does not in express terms name the trustees or fix the limits for taxation, but it does show that the result of the election naming appellees as the trustees and fixing the tax limits were certified to the council, spread upon the city's record books and approved by the council, and that the number of such trustees accorded with the provisions of the general law. The trustees thus elected and approved by the city council by ordinance, qualified, took possession of the offices and the schools and were engaged in the discharge of the duties incident to such offices in calling the election, confessedly held in compliance with section 4481 of the statutes, which authorizes an election to issue bonds. We are inclined to the opinion that appellees were appointed as trustees by the ordinance above referred to and were therefore *de jure* trustees, but if mistaken in this, which we do not decide, they were at least *de facto* trustees with color of title and their action in calling the election was not void, nor can they be enjoined from issuing the bonds and continuing in the discharge of the duties of trustees, at least not at the instance of appellants. See 22 Cyc. 888; Cooley's Constitutional Limitations, page 750; Wendt v. Berry, 154 Ky. 594; High on Injunctions, section 1315; Pence v. Frankfort, 101 Ky, 543.

We are therefore of the opinion that the election at which the bonds were voted was legal and that appellants have failed to present any reason why the injunction should have been granted.

Wherefore, the judgment is affirmed.